## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**SOUTHEASTERN MECHANICAL
SERVICES, INC.,**

        Plaintiffs,

vs.                                **Case No.: 8:08-CV-1151-T-30EAJ**

**NORMAN BRODY, et al.**

        Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes on for consideration of **Plaintiff's Motion for Preliminary Injunction** (Dkt. 12), and Defendants' response in opposition (Dkt. 44), as well as the additional memoranda and submissions of the parties, including exhibits, objections, and supplemental citations of authority.  The court entered a temporary restraining order on June 13, 2008.[1]

An evidentiary hearing has been held.  Having considered the evidence and arguments of the parties and these findings of fact and conclusions of law, I recommend that the motion for preliminary injunctive relief be  **GRANTED IN PART**.

### FINDINGS OF FACT

The following facts are either undisputed or have been established by a preponderance of the credible evidence.

    A.   <u>The Parties</u>

    1.   Plaintiff Southeastern Mechanical Services, Inc. ("SMS") is a Florida corporation with

---

[1]   The district court has referred this matter to the undersigned for consideration and a report and recommendation.  <u>See</u> 28 U.S.C. § 636(b); Local Rule 6.01(a), M.D. Fla.

its principal place of business in St. Petersburg, Florida.  SMS is a general and mechanical construction and maintenance contractor, providing boiler construction and project management services to electric utilities, waste-to-energy, food process, bio-mass, pulp and paper industries. (Dkt. 43 at 8)

2.   SMS is a competitor for certain business with Defendant Babcock Power Services, Inc. ("Babcock"), including Babcock's affiliate Defendant Thermal Engineering Construction Services, Inc. ("TEI") and Babcock Power, Inc. (T 59)[2] TEI competes with SMS for approximately 25 percent to 30 percent of the same projects.  (T 60) Their work overlaps primarily in the maintenance and repair of steam generating equipment. (T 58-59) Both companies service Florida customers. (T 104, 266-67)

3.   TEI is a Delaware corporation with its principal place of business in Duncan, South Carolina.  TEI's gross revenue for the last fiscal year was $55 million and its net revenue was approximately $4 million. (Dkt. 43 at 8; T 49)  Revenue from Florida customers accounts for about 19 percent of TEI's revenue. (T 85-86)

4.   Babcock is a Delaware corporation with its principal place of business in Worchester, Massachusetts.  Babcock's gross revenue for the last fiscal year was approximately $300 million and its net revenue was $25 million. (T 411)  Babcock is an affiliate of TEI and a subsidiary of Babcock Power, Inc.[3] (Dkt. 43 at 8)   Both Cladding Technology, a division of Babcock, and TEI are located in Duncan, South Carolina.  (Dkt. 43 at 8)

5.   TEI offers manual weld metal overlay services to its customers and Babcock offers 360

---

[2]  "T" refers to the hearing transcript.

[3]  Babcock Power, Inc.'s gross revenue for last year was nearly $1 billion.  (T 421)

degree single tube weld overlay at its South Carolina facility. (Pl. Ex. 50; T 59) TEI and Babcock do not provide automated field metal overlay services. (T 59, 351) They do boiler work for new installations and field maintenance; SMS does maintenance and repair of boilers but not new installations. (T 59, 351) TEI offers some manual 180 degree panel overlay services to its customers, but it does not do 360 degree single tube overlay work.[4] (T 104)

6.     Defendant Theodore Maliszewski ("Maliszewski") is president of Babcock and is in charge of managing the company's boiler services business. (Dkt. 43 at 8, Pl. Ex. 118)

7.     Dale Naughton is the president of TEI. (Dkt. 43 at 8)

8.     Defendant Norman Brody ("Brody") is the former National Accounts Sales Manager for SMS. (Id.) Defendant James Sherouse ("Sherouse") is the former Gulf Sales Regional Sales Director for SMS. (Id.) Defendant Kevin Smith ("Smith") is a former engineer with SMS and the former Director of Quality Assurance/Quality Control for SMS. (Id.)

9.     TEI's service area is primarily in the southeastern United States but it does some work in the area of the Rocky Mountains, Texas, Oklahoma and the Ohio Valley. (T 49) TEI has customers in Florida but services those customers from its Mississippi and South Carolina offices. (T 108) That was one reason that TEI sought to establish a Florida office so it could better serve its Florida customers. (Id.)

---

[4] Weld overlay is the application of a high chrome stainless steel or other resistant metal alloy on boiler tubes to protect against erosion and corrosion. (T 104) There are two methods of weld overlay: 360 degree single tube overlay and 180 degree panel overlay. (Id.) The 360 degree single tube overlay method involves overlaying the entire boiler tube with a metal alloy. (Id.) For the 180 degree panel overlay method, only one side of the boiler tube is overlaid with a metal alloy. Field weld overlay refers to work performed at the customer's location (T 104, 350) Manual weld overlay is performed by hand; automatic weld overlay refers to work performed using automated equipment. (T 59)

10.    During the summer of 2005, SMS and Babcock discussed a potential acquisition of SMS by Babcock.  (Pl. Ex. 119) In July 2005, Babcock received due diligence materials from SMS, including income statements, consolidated income statements, and operating expenses for years 1999 to 2005.  (Pl. Ex. 142)  Babcock also received a copy of SMS's "2004 Contracts in Progress."  (Id.)  When the discussions did not result in an acquisition of SMS, Babcock returned or destroyed these materials.  (Pl. Ex. 119)

11.    In June 2007, Babcock announced the opening of a new service center for Cladding Technology.  (Dkt. 43 at 8)  This division of Babcock deals exclusively with the weld overlay process. (Id.)

B.    Brody's, Sherouse's and Smith's Employment with SMS

12.    Brody joined SMS in 1994 and worked in the sales division.  (Dkt. 73)  Sherouse joined SMS in 2005 as Gulf Shores Regional Sales Manager.  (Dkt. 74)  In 1995, Smith joined SMS as an Engineer Manager. (Dkt. 75)   In or around 2002, SMS promoted Smith to the position of Director of Quality Control/Quality Assurance.  (Id.)  All  three  remained employed with SMS until late May/early June 2008 when they joined TEI.

13.    As SMS's national sales account manager, Brody was responsible for generating new business; he had access to customer lists, bidding information, and marketing information. (T 425-26) Sherouse's job duties as Gulf Sales Regional Sales Director for SMS included contacting customers, recording sales, preparing bid proposals, and communicating with superintendents regarding contract work.  (T 126, 141-42, 210)  In his position as Director of Quality Control/Quality Assurance, Smith reported directly to SMS's president and supervised numerous employees in his department. (T 330, 334)

14.   SMS employees are subject to the policies and standards of conduct set forth in SMS's Employee's Handbook ("Handbook").  (Pl. Ex. 7) [5]

15.   In May, 2006, Sherouse and Brody acknowledged receipt of SMS's Handbook.  (Pl. Ex. 37, 77) Although Smith did not receive a copy of the Handbook, he had some understanding of SMS's position with respect to company information being used and disclosed outside the company. (T 330)

16.   During his employment, Brody signed a confidentiality and non-compete agreement ("non-compete agreement") with SMS.  (Pl. Ex. 72)   It is undated but a printed date of 2001 is on the document.[6]  (Id.)

---

[5]  The Handbook sets forth acceptable "Standards of Conduct" and prohibits misuse or destruction of SMS property; unauthorized possession, use or copying of records that are the property of SMS; and unauthorized release of information about SMS or clients of SMS. (Id.) The Handbook prohibits SMS employees from utilizing SMS's information technologies, including its e-mail and telephone systems, for any purpose detrimental to SMS. (Pl. Ex. 7 at 11) the Handbook also prohibits SMS employees from revealing confidential or proprietary information without authorization, releasing such information without authorization, or from using such information or knowledge of SMS's operations, plans or investments for personal gain. (Id. at 11, 13)

[6]  Pursuant to the agreement, "confidential information" is SMS' information and materials relating to inventions, patents, trademarks, copyrights, improvements, know-how, trade secrets, specifications, drawings, cost and pricing data, process flow diagrams, bills, customer, vendor and supplier information, products, manufacturing processes, ideas, sales, financial, business plans, and marketing information.  (Pl. Ex. 72 at 1-2)   Under terms of the non-compete agreement, Brody agreed to keep all confidential information in strict confidence and not to disclose such information except for the purpose of carrying out his duties within the scope of his employment with SMS. (Id. at 2)  This paragraph was effective during Brody's employment with SMS and for five years after his last day of employment.  Pursuant to the agreement, Brody was required to return all equipment, computer software, records, reports, client and vendor lists and all documents or tangible items belonging to SMS to SMS, including all confidential information.  (Id. at 2-3) From the effective date of the agreement and for a period of two years following his termination, Brody agreed not to directly or indirectly work for a competitor of SMS.  (Id. at 3) Further, Brody agreed that disclosure of confidential information contrary to the terms of the agreement would result in irreparable harm to SMS.  (Id. at 5)   In the event of a breach of the agreement, Brody acknowledged that SMS has no remedy at law and is entitled to equitable and injunctive relief.  (Id.) SMS apparently discovered

17.    Brody, Sherouse, and Smith gained knowledge of SMS's organizational structure and relationships, employee information, work processes, engineering plans, and welding techniques as a result of their positions with SMS.  (Pl. Ex. 26, 41, 48, 55, 69, 93, 123; T 208-09)

18.    SMS employs approximately 100 employees and 50 of the employees use computers. SMS utilizes the MAS system which restricts to certain employees client contact information and lists, billing information, jobs costs, charges to job sites, profit margins and payment information. (Pl. Ex. 69)  About twenty-five SMS employees have access to MAS through the use of a password. (T  312) Access within the MAS system is limited to a need-to-know basis.  (Pl. Ex. 69)  When an employee leaves SMS, access to the MAS system is denied.  (T 315)

19.    Brody, Sherouse, and Smith had access to portions of the MAS system.  (Pl. Ex. 69) Smith did not have access to SMS's income statements or budget information on the MAS system. (T 333-34, 339-41)  Sherouse  had access to the MAS system, but on a limited scale due to his work needs.  (Pl. Ex. 69)  Sherouse worked from his home office and accessed the MAS system remotely. (T  126, 319)

C.    Employment Discussions with TEI and Babcock

20.    In December 2007, Sherouse approached Maliszewski of Babcock regarding any job opportunities at Babcock.  (Pl. Ex. 118 at 3)  Maliszewski subsequently introduced Sherouse to Paul Knight ("Knight"), a Babcock employee, who arranged an job interview for Sherouse with Tom Kyner ("Kyner"), of Babcock Part Sales Division.  (Id.)

---

Brody's non-compete agreement just before the preliminary injunction hearing.  It filed a Second Amended Complaint (Dkt. 35) listing Brody's breach of the agreement as a separate count. Although the court overruled Brody's objection to the non-compete agreement, SMS did not rely on this claim in seeking preliminary injunctive relief. (T 13-16)

21.    In early February 2008, Naughton, president of TEI, received the resumes of Brody and Smith from Jim Schneider ("Schneider"), a corporate head hunter. (T  60-61)  Schneider advised Naughton that SMS did not like other companies "stealing their people."  (T  61)

22.    On February 10, 2008, Naughton interviewed Smith on the telephone about TEI's interest in opening an office in Florida.  (Pl. Ex. 120)  Naughton also conducted a telephone interview with Brody.

23.    On February 19, 2008, Naughton sent Maliszewski an e-mail with  revenue and cost estimates for TEI's Florida regional office based on discussions and commitments by Smith.  (Id. at 1-2)  As part of TEI's operating expenses, Naughton added $100,000 "for fighting a lawsuit" with SMS "for stealing his people which Kevin [Smith] says will happen."  (Pl. Ex. 92 at 1)

24.    On February 22, 2008, Naughton wrote a memorandum to Maliszewski regarding his interview of Smith.  (Pl. Ex. 93)  Naughton stated that the fit between Babcock's and TEI's customers and customers that Smith would bring "is excellent with very little overlap."  (Id.)  Smith's relationships and those of the employees he would bring on board were with "Gulf Power Crist, OUC JEA, GRU, SCE&G and Pulp and Paper."  (Id.)  Naughton noted that Babcock and TEI had little or no business with these SMS customers.  (Id.)

25.    In March, 2008, Jim Wood ("Wood"), Chief Executive Officer of Babcock, and Gary Berndt ("Berndt"), Chief Operating Officer of Babcock, interviewed Smith regarding the Regional Manager position for TEI's Florida office.  (Pl. Ex. 120)

26.    On April 1, 2008, Sherouse wrote Maliszewski concerning a business plan for setting up offices in Florida for Babcock and TEI.  (Pl. Ex. 91)   He later attached a letter, also dated April 1, 2008 purporting to be from Sherouse, Smith, and Brody outlining the potential customers in the

Florida market, the revenues and profits for the first three years of operation, labor concerns, and the location of offices in Jacksonville and Pensacola.  (Id.)  The letter states that "we could get some opportunities as early as fall." (Id.)  For Year 1 "6 million would be the target, turning a profit of 20% after bills paid.  Year 2 would be 10 million, and Year 3 would be larger depending on the lines of work we want to be involved in."  (Id.)  The letter added that "These numbers are just that, we feel we can grow the business in Florida to have a presence not only in sales, but also in plant maintenance contracts, summer work, and repeat work without bidding."  (Id.) [7]

27.    The same day, Maliszewski forwarded a copy of the April 1, 2008 letter to Naughton. (Pl. Ex. 91) Maliszewski requested that Naughton read Sherouse's letter and give Maliszewski his thoughts.  (Id.)

28.    Naughton responded: "I can only see 2 issues which are the same as the issues we already discussed: a) how quickly they can break into "new" Customers and b) how quickly they can bring on additional field Supts and craftsmen." (Id.)

29.    Maliszewski e-mailed Sherouse that he had received and read the April 1, 2008 letter. (Pl. Ex. 26)   Maliszewski asked Sherouse, if TEI opened a Florida office, "how do we draw the necessary resources, both supervision and labor to justify cash outlay in year one?" (Id.)

30.    On April 3, 2008, Sherouse responded to Maliszewsi's inquiry and Sherouse stated that he and Smith knew about the labor force in Florida, while Brody had the business contacts to lead the sales.  (Id.)  Sherouse thought he could recruit a superintendent who worked on the Gulf Coast.

-------

[7]  Although some of the e-mails between Defendants appear to identify the sender's personal e-mail address (Pl. Ex. 26, 28, 33), other e-mails do not identify the sender's address (Pl. Ex. 63). Whether they were sent from home computers or a work computer is of little consequence to the issues presented.  Most of the e-mails between and among Defendants were sent during business hours.

According to Sherouse, the "project management will be done by all of us." (Id.) Sherouse mentioned that we are "being very careful about this conversation due to the problem it would cause if we were exposed with the new management of SMS." (Id.)

31.    Sherouse also notified Maliszewski that he would be interviewing with Babcock on April 16, 2008 and asked whether he should look at the job seriously. (Id.) Maliszewski replied affirmatively and advised Sherouse that the position was "budgeted and solid." (Id.)

32.    On April 3, 2008, James F. Wood ("Wood"), President and CEO of Babcock Power, Inc., e-mailed Maliszewski and other Babcock executives regarding how Sherouse would obtain the necessary labor force for a Florida office. (Pl. Ex. 123) Wood emphasized that Sherouse's and Smith's "product is relationships and how those relationships make money is by turning opportunities into labor contracts." (Id.)

33.    On April 16, 2008, Sherouse interviewed with  Kyner of Babcock Power regarding a possible position with TEI. (Pl. Ex. 102)

34.    Sherouse e-mailed Kyner on April 17, 2008 that he was interested in moving to TEI and hoped he could be part of the Babcock team. (Pl. Ex. 28)  Additionally, Sherouse wrote that the "180 degree overlay is huge, the potential is a very large market share, not counting the field installation side." (Id.)  Sherouse also noted that he would give SMS a two week resignation notice, but that SMS "may not take it because of the change with a competitor, but there will have to be a hand over to keep tab on work committed so far for SMS." (Id.)

35.    Maliszewski e-mailed Sherouse on April 24, 2008 to tell him that Sherouse's potential position at TEI had been approved. (Pl. Ex. 102)

36.    On April 29, 2008, Smith was offered a position as Regional Manager of TEI.  On that

same day, while still employed by SMS, Brody prepared an "Executive Summary" outlining a strategy for "Establishing Premier Overlay Operation in Florida." (Pl. Ex. AA)[8]   Brody noted that, for the Florida, Georgia and Mississippi region, the major competitor for 180 degree overlay work related to utility outages was WSI, an affiliate of SMS.  According to Brody, "no other Overlay companies have the expertise or equipment to take on major outages that have restrictive time frames." (Id.) Brody added that "[t]his group that does the bidding is a Union operation thus keeping prices artificially high." (Id.)   Brody identified several potential customers and indicated that "[t]he opportunities lie with those we are familiar with." (Id.)  Brody's strategy outline included a discussion of soliciting superintendents and other employees from SMS who would be willing to come work with Brody, Sherouse and Smith.  (Id.)

37.    On April 30, 2008, Brody e-mailed Sherouse that he was "trying to figure out how to have Robert King ("King") issue a P.O. to TEI for the repair that will probably be done May 12th." (Pl. Ex. 33) Brody considered calling TEI to obtain a TEI letterhead logo so he could submit a bid price.  (Id.)

38.    On May 7, 2008, Sherouse e-mailed Smith and Brody requesting a response to two questions posed by Maliszewski. (Pl. Ex. 36)  Sherouse's e-mail provided in pertinent part: "In a[n] e-mail, we are asked the following: On the 180 field overlay, what margins did SMS sell at and what is WSI selling at today?" (Id.)  Sherouse wrote that Maliszewski knew what SMS's and WSI's profit margins "is rumored to be." (Id.)   In addition to profit margin, Maliszewski wanted information concerning typical equipment utilization of field equipment.  (Id.)

---

[8]  This exhibit is among those which SMS sought to seal at the hearing, but the document is already in the public record as an exhibit. (Dkt. 4-5 ("Wright Declaration"), Ex. B)

39.   On May 9, 2008, Sherouse received a job offer from TEI.  (Pl. Ex. 42)

40.   On May 9, 2008, Brody received a job offer from TEI.  (Pl. Ex. 104)

41.   On May 10, 2008, Sherouse forwarded Smith's and Brody's responses to Maliszewski regarding the inquiries on SMS's profit margins and typical equipment utilization.  (Pl. Ex. 41)  Smith provided percentage figures for the profit margins of SMS and WSI for field 180 degree overlay work. (Id.)   In reference to equipment utilization, Smith wrote that "he really needs to do shop applied 180 with the same equipment utilized for the field.  This [is] very easy to do with the field equipment. Put a bug in his ear.  I feel sure we could get all of southern companies 180 overlaid panel business." (Id.)  Smith added: "One thought is Southern company would embrace us if we were doing field and shop 180, they are not happy with WSI."  (Id.)

42.    In an e-mail dated May 11, 2008, Maliszewski clarified what he was asking Brody, Sherouse, and Smith: "what I meant by equipment utilization is the amount of time equipment is used yearly. 50%, 75%, 40%? In a physical year 52 weeks, 5 days/week how often is equipment in use?" (Id.)

43.   On May 12, 2008, Sherouse e-mailed Maliszewski regarding a new market opportunity for "weld overlay tubing" from David K. Fuhrmann ("Fuhrmann"), an employee with Power Manufacturing Solutions. (Pl. Ex. 48)   The next day, Sherouse e-mailed Maliszewski that he had spent fifteen minutes on the telephone with Fuhrmann and that Smith would provide Fuhrmann with needed information.  (Pl. Ex. 49)   Fuhrmann agreed to put Sherouse on his bid list for a recovery boiler job in the fall.  Sherouse wrote: "Overlay has not been used in recovery for the most part so it's a new opportunity.  When I said [put] me on the bid list, I am hoping we have a field overlay group at that time."  (Id.)

44.   On May 13, 2008,  Maliszewski advised Sherouse that "we do 360 in our SC facility and have for many years.  It's just 180 we haven't yet done."  (Pl. Ex. 50)

45.   On May 19, 2008, Sherouse advised Naughton and Maliszewski about his lunch with a manager for Southern Company, a new installation project with Gulf Power, and that TEI would be invited to bid on the project.  (Pl. Ex. 55)

46.   On May 20, 2008, Brody advised Maliszewski about a potential project with Bermuda Waste.  (Id.)  According to Brody, WSI (an SM affiliate) had an exclusive repair contract at the Bermuda Waste plant and WSI's job performance was  marginal. (Id.)

D.   Brody's, Sherouse's and Smith's Resignation from SMS and Move to TEI

47.   On May 12, 2008, Smith submitted a letter of resignation to SMS.  (Dkt. 75)  Smith's last day of employment with SMS was on May 23, 2008.  (Id.)

48.   On May 23, 2008, Sherouse submitted his resignation letter to SMS.  (Pl. Ex. 57) Sherouse's last day of employment with SMS was on May 27, 2008.  (T 176)

49.   On May 27, 2008, Sherouse sent an e-mail to a number of SMS customers that he was resigning from SMS. (Pl. Ex. 63) Sherouse wrote: "I hope our relationship and the service I have given to you in the past will allow me to come and share with you what my new job and company can provide for you in your current work environment." (Id.)

50.   On May 26, 2008, Brody submitted a letter of resignation to SMS. (Pl. Ex. 104, p. 6) Brody's last day of employment with SMS was on May 27, 2008.  (Dkt. 73)

51.   On or about May 22, 2008, SMS terminated Smith's access to the MAS system.  (Pl. Ex. 69)  Similarly, on May 27, 2008, SMS cut off Brody's and Sherouse's access to the MAS system. (Id.)

12

52.    After terminating Brody's access to the MAS system, SMS reviewed Brody's e-mail Outlook program.  (Id.)  SMS discovered that Brody had deleted all of his Outlook files prior to his departure from SMS, including all e-mails and address book files.  SMS was not able to restore any of the files that Brody had deleted from his Outlook program.[9]  (Id.)

53.    On May 27, 2008 or May 28, 2008, Sherouse left SMS's IT Manager a voice mail asking for a copy of all of Sherouse's contacts within his Outlook account.  (Pl. Ex. 69)

54.    Smith started employment with TEI on May 26, 2008.  (T 66)

55.    Brody and Sherouse commenced employment with TEI on June 2, 2008. (Id.)

56.    At the end of their employment, Brody, Sherouse, and Smith returned their laptops to SMS. (Pl. Ex. 69) However, the hard drive on Sherouse's laptop was wiped clean of any data.[10]  (Id.) SMS has not been able to recover any of the data from Sherouse's laptop.  (Id.)  Furthermore, in March 2008 SMS purchased an external hard drive for Sherouse's laptop.  (Pl. Ex. 22)  Sherouse did not return the hard drive upon his resignation.[11]  (T 320)

57.    Sherouse copied SMS's confidential and proprietary information from his laptop computer to a  thumb drive, including the following documents: bid preparation software, time and material rate sheet, and superintendent's bonus  program tracking report.  (T 153, 194-95, 210-12;

---

[9]  Brody testified that pursuant to SMS's instructions about deleting old e-mails and junk e-mails from his computer, Brody deleted e-mails from his computer. (T 462) This is not a credible explanation, however, for Brody deleting all of his emails and address book files from his computer.

[10]  Sherouse used a software program to remove all data from his laptop computer before returning it to SMS.  Sherouse's testimony that he permanently deleted all the information on his laptop because there were personal files relating to his divorce and his mother's finances (T 176-78) is not credible as to why all data was removed.

[11]  Any testimony to the contrary by Sherouse is not credible.  (T 131)

13

Pl. Ex. A, D, E)[12]  After leaving SMS's employment, Sherouse had three boxes of SMS documents at his home.  (T 150; Pl. Ex. 102)

58.   When he left SMS, Sherouse downloaded proprietary bid preparation software program from his SMS laptop.  (Pl. Ex. A, C, O)   After Sherouse started his employment with TEI, he transferred this software program from a thumb drive to his TEI computer.  (T 153)  In preparing the TEI bid for the Paragon contract,[13] Sherouse utilized SMS's bid calculation tool and informed Smith that he was using the SMS software to prepare the bid.  (Pl. Ex. A, B; T 153-54, 336-37)

59.   After Smith received the copy of the Paragon bid proposal from Sherouse, Smith deleted the SMS logo from the document, substituted TEI's name in the bid proposal and forwarded the bid proposal to Naughton.  (Pl. Ex. A, B; T 336-37)   Naughton instructed Smith to run the bid again using TEI's software.  (T 157, 159)  Sherouse testified that there was a $1,000 difference using TEI's bid software.  For the final TEI bid, Sherouse split the difference between the two bid proposals.[14] (T 158)

60.   Maliszewski admitted that Sherouse's downloading of SMS information and software

---

[12]  At the preliminary injunction hearing, SMS's exhibits A through DD were admitted under seal subject to the court's determination of whether the documents were entitled to trade secret protection. (T 10, 504-05)  Plaintiff took adequate steps to maintain the trade secret status of most of the sealed exhibits.  Although this report and recommendation includes citations to sealed exhibits, the contents of any exhibit which has been sealed are not discussed with the exception of Pl. Ex. AA, see infra, which was already in the public record.  See also p. 9, infra.

[13]  Paragon is a company for whom TEI prepared a bid for the installation of aerator seals. (T 68)

[14]  TEI's subsequent withdrawal of its Paragon bid does not negate the usefulness of the confidential information to Defendants.  (T 68)  If anything, TEI's withdrawal of its bid after SMS filed its motion for a temporary restraining order supports the finding that Defendants willfully misappropriated SMS's confidential and proprietary information.

from Sherouse's computer and use of this information on TEI's computer system was unethical and wrong. (T 405-06) Maliszewski also acknowledged that it was unethical for Sherouse and Smith to use SMS information and software to prepare TEI's bid proposal for the Paragon project. (T 408)

61.    When Smith left SMS's employment, he had approximately 100 documents, at least six computer disks, and a flash drive containing SMS information. (T 332-34) Smith obtained the information on the six computer disks and the two income statements from other SMS employees. (T 333-37, 339-41) Smith did not have authority from SMS to take any SMS information with him when he resigned. (T 335) When Smith left, he had the following SMS documents in his possession: income statements, manpower schedule, superintendent's bonus program tracking report, tool trailer inventory list, balance sheet, schedule of jobs, time and material rate sheet, and fabrication division proposal data tracking information.[15]   (T 335-39; Pl. Ex. 103, 119, 120)   Several SMS documents that Sherouse and Smith obtained from SMS were identical to documents found on a TEI computer, including the bid preparation software, superintendents' bonus program tracking report, and a 10 second customer evaluation summary. (Pl. Ex. A, B, E, F, P, Q) These documents had the TEI logo affixed to them. (Id.)

62.    SMS has spent approximately $20,000 in determining what information has been copied or deleted from SMS's computers. (T 505) SMS has spent over $6,000 in determining what files were deleted from Sherouse's computer and whether the files could be restored. (T 506)

63.    On June 17, 2008, following this lawsuit, Brody, Sherouse, and Smith were placed on administrative leave with TEI. (T 66)

---

[15]   Naughton testified that TEI's financial statements, income statements, balance sheets and audited statements are confidential and proprietary. (T 19-20)

64.    Joel Worth, Vice President of SMS, credibly testified that SMS's bid calculation tool (Pl. Ex. A) is software created over a period of several years to estimate project costs and could provide a competitor an advantage.  (T 499)  It is not commercially available.  (Id.)  Worth explained that SMS's manpower schedule contained SMS's pay rates, labor costs, worker compensation rates and liability issues.  (Pl. Ex. C; T 500)   Worth also testified that SMS's schedule of labor rates is a spread sheet developed by SMS to estimate SMS labor rates.  (Pl. Ex. D; T 500)  According to Worth, a competitor would have an advantage in possessing SMS's schedule of labor rates because it could estimate labor rates similar to SMS's rates.[16]   (Id.)  SMS's software program for estimating fabrication shop costs would also provide a competitor an advantage; this software is not commercially available.  (Pl. Ex. V; T 504)

## CONCLUSIONS OF LAW

To obtain a preliminary injunction, the moving party must prove: (1) a substantial likelihood that it will ultimately prevail on the merits; (2) a showing that it will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to it outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.  Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005).  The Rule 65 standard applies to claims of injunctive relief under state law claims.  Ferrero v. Assoc. Materials, Inc., 923 F.2d 1441, 1448 (11th Cir. 1991).

"The preliminary injunction is an extraordinary and drastic remedy not to be granted unless

---

[16]  There are construction publications, referred to as "hot sheets," which announce upcoming construction contracts and identify wage rates, overtime rates, as well as per diem and travel rates that will be paid.  (T 78-79)   The existence of such general information in the industry does not undercut the value of knowledge of SMS's particular labor rates.

the movant 'clearly carries the burden of persuasion' as to the four prerequisites." Cunningham v. Adams, 808 F.2d 815, 819 (11th Cir. 1987) (citation omitted).   In considering a motion for preliminary injunction, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for the entry of a permanent injunction.  Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).

Pursuant to Plaintiff's Second Amended Complaint (Dkt. 35), SMS asserts claims for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by all Defendants (Count I); tortious interference with business relationships by all Defendants (Count II); misappropriation of trade secrets in violation of Florida Statutes § 688.001, et seq., by all Defendants (Count III); breach of duty of loyalty by the individual Defendants Brody, Sherouse, and Smith (Count IV); conversion by all Defendants (Count V); violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, et seq., by all Defendants (Count VI); conspiracy by all Defendants (Count VII); breach of non-compete agreement by Defendant Brody (Count VIII); breach of contract to return SMS property by Defendant Brody (Count IX); and breach of contract not to disclose confidential information by Defendant Brody (Count X).   However, the Second Amended Complaint (adding Count X) was filed the day before the preliminary injunction hearing and SMS focused on the first three counts in seeking preliminary injunctive relief.

I.      Substantial Likelihood of Success on the Merits

To demonstrate a substantial likelihood of success on the merits, SMS must make a showing of likely or probable, but not certain, success at trial, on one or more claims.  At oral argument, SMS asserted that it had met this prong as to the claims of misappropriation of trade secrets, tortious interference with business relationships, and violations of the CFAA.

17

A.      Misappropriation of Trade Secrets

The Uniform Trade Secrets Act, Fla. Stat. § 688.001, et seq., permits injunctive relief to redress any actual or threatened misappropriation of trade secrets.  A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process that a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Fla. Stat. §§688.002(4)(a),688.002(4)(b). "Misappropriation" involves the "[d]isclosure or use of a trade secret" without consent by an individual who used "improper means" to acquire the trade secret, or "[a]t the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret . . . was [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Fla. Stat. § 688.002(2). "Improper means" may include misrepresentation or breach of duty to maintain the secrecy of the trade secret.  Fla. Stat. § 688.002(1).  The maintenance of standards of commercial ethics is one of the broadly stated policies behind the trade secrets law. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481 (1974).

Florida law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment.  Unistar Corp. v. Child, 415 So. 2d 733, 734 (Fla. 3d DCA 1984).[17]  However, an employer may not preclude

----

[17]  The lack of an express agreement not to disclose a trade secret or confidential information is not dispositive of the court's authority to issue an injunction. Merrill v. Dunn, 191 F. Supp. 2d 1346, 1350 (M.D. Fla. 2002).  "The law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was  acquired by the employee in the course of his employment." Id. at 734

its former employee from using contacts and expertise gained during his former employment.  Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) (citation omitted). Information that is generally known or readily accessible to third parties does not constitute a  trade secret under Florida law.  Furmanite Am., Inc. v. T.D. Williamson, Inc., 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007).  Whether the trade secret was the subject of reasonable efforts to maintain its secrecy is a fact-intensive determination.  Jadael, Inc. v. Elliott, No. 6:05-CV-1623-Orl-DAB, 2007 U.S. Dist. LEXIS 63696 at *23-24 (M.D. Fla. Aug. 29, 2007).

To prevail on its claim for misappropriation of trade secrets, SMS must demonstrate (1) a likelihood that Defendants misappropriated secret information from SMS and (2) that SMS made reasonable efforts to maintain the secrecy of its trade secrets, resulting in damages.

In June 2007, TEI opened a new service center for Cladding Technology.  TEI and Babcock were interested in establishing an office in Florida that could compete with SMS for field overlay work, including field 360 single tube weld overlay and field 180 degree panel overlay.

While Brody, Sherouse, and Smith were still working for SMS, they were secretly negotiating with Babcock and TEI to start a new competing business.  During this time, the defendants discussed SMS's profit margins on field overlay work, SMS's current and potential customers, and potential bid projects.

Additionally, the individual defendants downloaded SMS's proprietary information including manpower schedules, time and material rate sheets, and financial information and took it to their new

---

(quoting Unistar, 415 So. 2d 734-35).  Although "the planning of a competing business is not a breach of an employee's duty of loyalty," an "employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." Fish v. Adams, 401 So. 2d 843, 845 (Fla. 5th DCA 1981).

jobs with TEI. The corporate defendants, while denying any complicity in these acts, implicitly encouraged them by soliciting proprietary information from Sherouse, Brody, and Smith during their pre-employment discussions. Once employed with TEI, the defendants promptly utilized SMS's bid preparation software. TEI even budgeted $100,000 to defend a lawsuit by SMS for "stealing its employees."

Defendants argue that SMS's profit margins do not constitute a trade secret because SMS's bid information for contracts is generally available. However, this argument is belied by Maliszewski's e-mail regarding the "rumors" of profit margins for SMS and WSI. TEI recruited Brody, Sherouse, and Smith to develop a customer base for this type of work. The disclosure and use of SMS's profit margin for field overlay projects gives TEI a competitive advantage in bidding on this same type of work. Johnson Controls, Inc., v. Rumore, No. 8:07-cv-1808-T-17TBM, 2008 U.S. Dist. LEXIS 4310, at *30-35 (M.D. Fla. Jan. 23, 2008) (plaintiff demonstrated likelihood of success on misappropriation of trade secret claim because former employee likely to utilize knowledge of company's markup, margins and cost structure used for bidding jobs); Hatfield v. Autonation, Inc., 939 So. 2d 155, 158 (Fla. 4th DCA 2006) (plaintiff showed likelihood of success where former employee took documents, downloaded confidential computer files and sent e-mails containing proprietary information necessary to start a competing business).

Defendants do not dispute that Sherouse and Smith used SMS's software program to prepare a TEI bid for a Paragon project. TEI used SMS's software program to underbid SMS's numbers for the Paragon project. In fact, Smith deleted the SMS reference and substituted TEI's name and forwarded the bid proposal to Naughton. Additionally, when Sherouse and Smith left their jobs with SMS, these employees took other SMS confidential and proprietary information with them, including SMS's

20

manpower schedule, time and material rate sheets, balance sheets and income statements.[18]  Several of these confidential documents were found on TEI's computers with the TEI logo affixed to them. Furthermore, Naughton conceded that TEI's financial statements, income statements, balance sheets and audited statements are confidential and proprietary information.  SMS's sensitive financial documents are similarly confidential and proprietary.  See Arch Aluminum & Glass Co. v. Haney, 964 So. 2d 288, 233 (Fla. 4th DCA 2007)  (financial statements are confidential information).

The corporate Defendants knew or had reason to know that the individual defendants' knowledge of SMS's proprietary information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Maliszewski admitted that Sherouse's downloading of SMS information and placing it on TEI's computer system was unethical and wrong.  Maliszewski acknowledged that it was unethical for Sherouse and Smith to use SMS information to prepare TEI's bid for the Paragon project. Months before TEI hired Smith, Naughton mentioned to Maliszewski that a lawsuit with SMS was likely and set aside money in the operating budget for TEI's Florida office to fight it.  Given the emphasis the executives of Babcock and TEI placed on obtaining SMS's information, it is reasonable to infer that these defendants believed this information was confidential and proprietary.

SMS also employed "reasonable efforts" to main the secrecy of its confidential and proprietary information.  To protect its confidential and proprietary information, SMS utilized a restricted computer system accessible by password.  Brody, Sherouse, and Smith had limited access to the MAS system.

---

[18]  The "UDI Who's Who at Electric Power Plants," identifies power plants and steam generators and provides the name, location and contact information.  (Def. Ex. 2)  There are similar public lists and publications which provide the name, location and contact information for pulp and paper plants, waste-to-energy facilities and petrochemical plants. (T 70-71)  Although this type of general information is publicly available in the industry, Brody, Sherouse and Smith were recruited by Defendants to use their prior relationships with SMS customers and specific knowledge about SMS customers to compete with SMS.

Indeed, Smith circumvented SMS's restricted access to financial information by obtaining some information from another SMS employee. Brody, Sherouse, and Smith also sought to circumvent SMS's security measures when using their home e-mail addresses to communicate with executives from Babcock and TEI. In addition, SMS's confidentiality policy (of which Brody, Sherouse, and Smith were aware) required employees to maintain the secrecy of its proprietary information. Further, Brody had signed a confidentiality agreement intended to protect SMS's confidential information. Thus, at the time defendants misappropriated SMS's confidential and proprietary information, SMS had made reasonable efforts to maintain the secrecy of its proprietary information. US Green Fiber v. Brooks, No. 02-2215, 2002 U.S. Dist. LEXIS 27944, at *12 (W.D. La. Oct. 25, 2002) (plaintiff took reasonable efforts to maintain the secrecy of information by instituting a confidentiality policy and by using password protection to limit access to this information to authorized employees); Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 512 (N.D. Ill. 1985) (although employee did not sign confidentiality agreement, plaintiff satisfied reasonable efforts requirement where it limited access to information and advised employee to preserve confidentiality).[19]

Defendants argue that as a result of SMS's disclosure of some confidential documents in this case, these documents have lost their status as trade secrets. With a couple of exceptions, this argument is unpersuasive.[20]

The dispositive question in a claim for misappropriation of trade secrets is whether the

---

[19] Defendants point out possible measures that SMS chose not to employ, such as labeling information as "confidential" or "trade secret." The fact that SMS conceivably could have done more does not make what it did do unreasonable.

[20] See Dkt. 45 (addressing SMS's motion to seal Plaintiff's Exhibits A through DD and motion to seal transcript of hearing on preliminary injunction).

information was a trade secret at the time it was taken.  SMS has shown that it is likely to prevail on its claim of misuse and misappropriation of confidential or proprietary information or trade secrets.

      B.    Tortious Interference

SMS asserts that while Brody, Sherouse, and Smith were still employed by SMS, they used SMS's computers and other resources to solicit SMS's customers in order to obtain their business for Babcock and TEI.

The elements of a claim for tortious interference are: (1) the existence of a business relationship between  plaintiff and a third party; (2) defendant's knowledge of that relationship; (3) defendant's intentional and unjustified interference with that relationship; and, (4) consequent damage to plaintiff. KMS Rest. Corp. v. Wendy's Int'l., Inc., 361 F.3d 1321, 1325 (11th Cir. 2004).

SMS is likely to prevail on its claim for tortious interference.  In e-mails and letters to their future employer, Brody, Sherouse, and Smith identified SMS customers they intended to solicit for field overlay work.  Sherouse wrote to his SMS customers to solicit their business with his new employer. Babcock and TEI did little or no field overlay business with the SMS customers targeted by Brody, Sherouse, and Smith.   Executives at Babcock and TEI emphasized the importance of using SMS customer relationships to obtain new contracts for Babcock.   Even before Brody, Sherouse, and Smith left their employment with SMS, they were trying to steer business to TEI and away from SMS. Additionally, Brody, Sherouse, and Smith communicated with executives at Babcock and TEI about recruiting SMS employees to join TEI.

      C.    Violations of the Computer Fraud and Abuse Act

Section 1030(g) of the CFAA allows any person who suffers damage or loss by reason of a violation of this section to maintain a civil action against the violator to obtain compensatory damages

and injunctive relief or other equitable relief.  18 U.S.C. § 1030(g).

The record shows a likely violation of subsections 1030(a)(4) and 1030(a)(5).  In order to prove a claim under the former subsection, a party must satisfy four elements: that the defendant (1) accessed a "protected computer" (2) without authorization or by exceeding such authorization as was granted, (3) "knowingly" and with "intent to defraud", and (4) as a result "further [ed] the intended fraud and obtain[ed] anything of value.  18 U.S.C. § 1030(a)(4).  Subsection 1030(a)(5) creates liability under the statue for whoever (1) "knowingly" causes the transmission of a program, information, code or command, and as a result of such conduct "intentionally" causes damage without authorization, (2) "intentionally" accesses a protected computer without authorization and as a result of such conduct, recklessly causes damage, or (3) "intentionally" accesses a protected computer without authorization, and as a result of such conduct, causes damage.  18 U.S.C. § 1030(a)(5).  Subsection 1030(a)(5) includes violations and attempted violations, provided that the conduct caused loss within a one-year period of at least $5,000 in value in the aggregate.   18 U.S.C. § 1030(a)(5)(B)(I).  The unauthorized damage to a computer, including the deletion of data on the computer, is a violation of subsection 1030(a)(5). B&B Microscopes v. Armogida, 532 F. Supp. 2d 744, 758 (W.D. Pa. 2007).  Loss is defined as any reasonable costs to any victim, including the costs of responding to an offense, conducting a damage assessment, and restoring the data, program, systems or information to its condition prior to the offense.  18 U.S.C. § 1030(e)(11).

SMS is likely to prevail on the claim that the Defendants violated subsection 1030(a)(4) of the CFAA, at a minimum.  Brody, Sherouse, and Smith accessed SMS computers and, without SMS's authorization, misappropriated SMS's proprietary information for the benefit of Babcock and TEI.  In addition, several of the SMS documents that Sherouse downloaded from his computer were identical

24

to documents found on TEI's computers with TEI's logo affixed to them.

Although Babcock, TEI, Maliszewski, and Naughton may not have accessed SMS's computers, the e-mail communications among the Defendants supports SMS's assertions that Babcock, TEI, Maliszewski and Naughton implicitly induced and/or encouraged Brody, Sherouse, and Smith to access and use SMS's information without authorization. At Maliszewski's urging, these employees e-mailed TEI and Babcock the profit margins of SMS, information about SMS's current customers and potential SMS customers to target. Likewise, Naughton knew that Sherouse and Smith were utilizing SMS's bid preparation software to prepare TEI's bid for the Paragon project. Where a new employer seeks a competitive edge through the wrongful use of information from the former employer's computer system, plaintiff will likely win on the merits of a CFAA claim. PharMerica, Inc. v. Arledge, No. 8:07-cv-486-T-26MAP, 2007 U.S. Dist. LEXIS 19992, at *21 (M.D. Fla. Mar. 21, 2007); see Binary Semantics, Ltd. v. Minitab, Inc., No. 4:07-cv-1750, 2008 U.S. Dist. LEXIS 28602, at *14-15 (M.D. Fla. Mar. 20, 2008) (plaintiff alleged violation of CFAA where defendant directed plaintiff's employee to e-mail proprietary information belonging to plaintiff); Shurgard Storage Ctrs, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 1121, 1124-1125 (W.D. Wash. 2000) (defendant violated CFAA because plaintiff's employee acted as agent for defendant and sent e-mails to defendant containing trade secrets and proprietary information belonging to plaintiff).

SMS is also likely to establish that Brody, Sherouse, and Smith violated subsection 1030(a)(5) of the CFAA by deleting or removing information from SMS's computers. Brody intentionally, and without authorization, deleted e-mails and contacts from his Outlook program; this missing data has not been recovered. Sherouse erased all the data on his laptop computer; this data has not been recovered. Also, Sherouse failed to return a backup hard drive when he left SMS's employment. For his part, Smith

took computer disks and a thumb drive containing SMS information. In view of the timing and circumstances surrounding the deletion and loss of information from these computers, the evidence suggests that Defendants' actions were willful and malicious.  PharMerica, 2007 U.S. Dist. LEXIS 19992, at *19-20 (permanent deletion of files from laptop computer without authorization violated subsection 1030(a)(5) of the CFAA); see B&B Microscopes, 532 F. Supp. 2d at 758 (the knowing and intentional deletion of record of sales, customer lists and service records on a laptop computer violates the CFAA because it caused damage to plaintiff of at least $5,000).

SMS has incurred at least $26,000 in damages in determining what information has been copied or deleted from SMS's computers and Sherouse's laptop computer.  As such, SMS has demonstrated a likelihood of success on its claim that Brody, Sherouse, and Smith permanently deleted or took computer data from SMS without authorization.

II.      Irreparable Harm

SMS must next establish that it will suffer irreparable harm absent injunctive relief.  SMS contends it faces irreparable harm to its existing customer relationships, reputation in the industry, and goodwill as a result of Defendants' actions.

Irreparable harm or injury is "'the sine qua non of injunctive relief.'" Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted).  In order to qualify as irreparable, harm or injury must be "actual and imminent."  Id.

Pursuant to Florida law, irreparable harm is presumed when a party appropriates or intends to appropriate trade secrets for its own use or the use of another unauthorized party.  PSC, S.A., v. PriceSmart, Inc., No. 07-21383-CIV-Cooke/Brown, 2007 U.S. Dist. LEXIS 69252, *18 (S.D. Fla. Sept. 19, 2007).  Irreparable harm can be presumed in cases involving wrongful interference with business

relationships. <u>Dotolo v. Schouten</u>, 426 So.2d 1013, 1015 (Fla. 2nd DCA 1983).  The loss of customers and good will is an irreparable injury and is difficult to measure. See <u>Ferrero</u>, 923 F.2d at 1449.

Defendants contend that SMS cannot establish irreparable injury because SMS did not prove it had advantageous business relationships or contracts with its customers. The lack of a contractual relationship or an exclusive relationship with its customers is not fatal to proof of irreparable injury. <u>See N. Am. Prods. Corp. v. Moore</u>, 196 F.Supp.2d 1217, 1230-31 (M.D. Fla. 2002). The focus of preliminary injunctive relief is on maintaining long standing relationships and preserving the goodwill of a company built up over the course of years of doing business. <u>Id.</u>  Whether a company has a contract with its customers has no bearing on whether the company has been or will be damaged by solicitation of its customers.  <u>Id.</u> at 1231.  Businesses may sell products and services to their customers on a consistent basis without a contract.  <u>Id.</u>

SMS has demonstrated irreparable harm warranting preliminary injunctive relief.  It has expended considerable time, money and resources in building its field weld overlay business.  Because Brody, Sherouse, and Smith were tasked to develop a new customer base for field weld overlay work for TEI, and in view of Defendants' use of SMS's confidential information, it is likely that Defendants will continue to use such confidential and proprietary information for the benefit of Babcock and TEI and to the competitive disadvantage of SMS unless enjoined.  There is a need for immediate injunctive relief when employers are threatened by conduct of former employees that would "irreversibly alter the status quo." <u>PharMerica</u>, 2007 U.S. Dist. LEXIS 19992, at *22 (citation omitted).  Once Defendants solicit SMS's customers or compete with SMS using confidential information, the customers cannot be "unsolicited." <u>Id.</u>

III.    Balance of Hardships

SMS faces potentially irreparable injury in the form of lost customers, goodwill, and misappropriated trade secrets.   TEI does $55 million in business; Babcock's most recent revenues were approximately $300 million. SMS is a much smaller company.  Moreover, Defendants have improperly used SMS's confidential information, computer records, and  business relationships in their efforts to generate new business.

Based on these considerations, the threatened injury to SMS outweighs the harm a  narrowly tailored preliminary injunction might cause Defendants.

IV.    Public Interest

Finally, the court must examine whether "granting [a] preliminary injunction will disserve the public interest." E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 n.13 (11th Cir. 1985).   A preliminary injunction would not disserve the public interest; a preliminary injunction would affirmatively serve the public interest by  protecting business from misappropriation of confidential information and resources. PharMerica, 2007 U.S. Dist. LEXIS 19992, at *24. Remedies at law are often insufficient because of the time-sensitive nature of the confidential information and the possible advantage it could engender to the defendant.  Id.

In this case, a preliminary injunction limited in scope is appropriate and will not disserve the public interest.

V.    Relief Requested and Bond Amount

SMS seeks to enjoin Defendants from:  (1)  using, printing, copying, distributing, disclosing or examining any information from or belong to SMS, including SMS's customer lists, customer information, employee lists, employee information, sales techniques and pricing systems and structures,

(2) soliciting any business from any of SMS's clients or customers, and (3) soliciting for employment or any other business or competitive purpose any employees of SMS, or from hiring any SMS employee solicited in the last six months.  (Dkt. 54 at 1-2; Pl. Ex. 90)   SMS also requests that Defendants, their agents and employees return all SMS information and property to SMS.  (Dkt. 54 at 2)  SMS seeks an order requiring Brody, Sherouse, and Smith to deliver their computers to SMS's counsel for forensic imaging.  (Id.)  Finally, SMS seeks an order restraining Defendants from destroying or causing to be destroyed any and all information and documents which are potentially relevant to SMS's claims.[21]  (Id.)

Although some type of relief of injunctive relief is warranted, the scope of relief sought by SMS is too broad.  Ample grounds exist to enjoin Defendants from using and disclosing confidential and proprietary information belonging to SMS, to require Defendants to return all SMS information and property to SMS, and to restrain Defendants from destroying (or causing to be destroyed) any information relevant to SMS's claims.[22]

Most crucial to the scope of the relief requested by SMS is its request concerning its customers. SMS seeks to enjoin Defendants from soliciting business from any of SMS's clients or customers.   This is too broad.[23]  Since the purpose of preliminary injunctive relief is to maintain the status quo, it is

---

[21]  The preliminary injunction order filed  by SMS is identical to the temporary restraining order entered in this case.

[22]  The request for the individual Defendants' computers is more appropriately addressed in the context of discovery where appropriate limitations and a protocol can be established.  SMS did not propose any limits on such an examination at the hearing.

[23]  Whether SMS will seek additional relief against defendant Brody due to the agreement he allegedly signed with SMS is unclear; the motion for preliminary injunction did not seek to enforce this agreement, apparently because the agreement was obtained only recently by SMS.

reasonable to prohibit Defendants from engaging in automated field overlay work in Florida,[24] as this is the type of work that Defendants were not providing (and were unable to provide) prior to TEI's hiring of Sherouse, Smith, and Brody.  Both TEI and SMS did manual repairs for their Florida customers before the events which led to the filing of this lawsuit.  TEI also serviced new installations; SMS did not.

Therefore, whether soliciting work or responding to bid requests, prohibiting Defendants from engaging in automated  field overlay work should adequately protect against irreparable injury to SMS stemming from Defendants' unlawful activities while permitting the corporate Defendants to compete for the type of projects they engaged in before Sherouse, Smith, and Brody joined TEI.

Moreover, Babcock and TEI targeted the lucrative Florida market in hiring these Defendants and using SMS's proprietary information.   Thus, limiting the geographic scope of an injunction to Florida customers is appropriate.[25]

It is evident that both Plaintiff and the corporate Defendants have serviced some of the same customers in Florida.[26]  Defendants should not be prohibited from doing work for Florida customers it

---

[24]  "Automated field overlay work" includes what has been referred to as both "field overlay work"  and "automatic 180 overlay."

[25]  "Florida customers" would also include work in Florida for customers headquartered outside the state.

[26] At the close of the hearing, the court asked  SMS's counsel how Defendants were to know who SMS's customers were if enjoined from soliciting them.  Counsel produced a computerized customer list with 392 names and asked that it be filed under seal. (T 594-97; Pl. Ex. DD) No other information is included such as dates and type of work performed or where these customers are located.  Moreover, as Defendants noted, SMS  failed to produce this document during its evidentiary presentation which denied Defendants the opportunity to cross-examine. In contrast, during the hearing, TEI produced a five-page chronological list of customers for whom TEI has bid projects in Florida since 1997. (Def. Ex. 1; T 51-55)  According to TEI, the list includes customers with whom the company has existing relationships. (T 55) Without an exhaustive review of the two

had prior to hiring Sherouse, Brody, and Smith. Only those Florida customers which were exclusively SMS's customers should be off limits to Defendants. An additional limitation on the relief requested by SMS is also appropriate. If SMS has not done automated field overlay work for any of its Florida customers in the past five years, Defendants should not be prohibited from doing such work for those companies even if they were exclusively SMS's customers.

It would also be unreasonable to prohibit Defendants from performing automated field overlay work for SMS's customers if Defendants solicited or were asked to bid on this type of work prior to the hiring of Sherouse, Brody, and Smith. However, based on the record, it does not appear that Defendants have any projects which fall into this category.

Accordingly, if the court is inclined to order preliminary injunctive relief as recommended, prior to doing so, counsel for SMS and counsel for Babcock and TEI should compare the companies' Florida customer lists and supporting data and identify for the court those customers which fall into this category: SMS's exclusive Florida customers for whom SMS has done automated field overlay work within the past five years.

Federal Rule of Civil Procedure 65(c) states that "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have

---

lists (which is SMS's job as the movant in this case), the court notes that there are a number of customers whose names appear on both lists. Moreover, testimony during the hearing indicated that the same customer (if a utility company, for example) will have a number of different sites; work on each of those sites could be bid separately. Thus, the court is faced with a "catch 22": SMS wants Defendants to be prohibited from soliciting its customers without regard to whether these companies were also customers of Babcock and TEI before Sherouse, Smith, and Brody were hired. As a matter of due process, Defendants need to know what conduct is prohibited by injunctive relief. Also, to prevent the court from being presented with contempt motions every time Defendants bid on a project, injunctive relief needs to be narrowly tailored and specific.

been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). At the hearing, SMS and Defendants did not suggest a bond amount.  However, Defendants requested a substantial bond in view of Babcock's net revenue and the financial impact of prohibiting Babcock and TEI from soliciting new business. (T 584-85) SMS argues that bond should not be substantial because Defendants have no earnings and no business activity in the particular field weld overlay work at issue here. (T 594)  In the event that the court grants preliminary injunctive relief, the undersigned recommends a bond amount of $100,000.

Upon consideration, it is **RECOMMENDED** that SMS's motion for preliminary injunction (Dkt. 2) be **GRANTED IN PART** and **DENIED IN PART** as follows:

1)      SMS's motion should be **GRANTED** and a preliminary injunction (pending further order of final disposition of this case) **ISSUED** as to:

(a)     Defendants' use of SMS's confidential and  proprietary information, prohibiting Defendants from using, printing, copying, distributing, disclosing or examining confidential and proprietary information belonging to SMS, including SMS's customer lists, schedule of labor rates, customer information, employee lists, employee information sales techniques and pricing systems and structures;

(b)     Defendants' duty to return all SMS information and property to SMS;

(c)     Defendants' duty to refrain from destroying (or causing to be destroyed) any and all information and documents which are relevant to SMS's claims, including computers;

(d)     Defendants' engaging in automated field metal overlay work for SMS's Florida customers (as defined herein);

(2)     All other relief requested should be **DENIED**;

(3)     The preliminary injunction should be conditioned upon SMS posting a bond in the amount

of $100,000.

**Date: July 25, 2008**

ELIZABETH A JENKINS
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal and a <u>de</u> <u>novo</u> determination by a District Judge.  <u>See</u> 28 U.S.C. §636(b)(1).

Copies to:
District Judge
Counsel of Record